828 F.2d 20
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Herbert F. SICKMAN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellee.
 No. 86-6211
 United States Court of Appeals, Sixth Circuit.
 September 8, 1987.
 
 Before MILBURN and RYAN, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Claimant Herbert F. Sickman appeals the summary judgment granted in favor of the Secretary on his claim for social security disability benefits. Claimant argues that the Administrative Law Judge's conclusion that he is capable of performing sedentary work is not supported by substantial evidence. He further contends that application of the grid was improper. For the reasons that follow, we affirm.
 
 I.
 
 2
 Claimant filed an application for disability insurance benefits on May 13, 1983, alleging disability beginning on November 5, 1982. The injuries forming the basis for his claim occurred when he received a severe electrical shock while working on a construction site.
 
 
 3
 Claimant's application was denied initially and upon reconsideration. Claimant requested a de novo hearing which was held before an Administrative Law Judge ('ALJ') on March 14, 1984.
 
 
 4
 The evidence produced at the hearing established that claimant's injuries occurred during the course of his employment in Butte, Montana. He was working on top of a trailer, fourteen feet above the ground, when high tension wires containing 12,000 volts of electricity fell and hit him on the back. He fell off the trailer onto the ground, sustaining third-degree burns and a head injury. He suffers the residuals of an entrance wound on his right shoulder and exit wounds on his feet. As a result of the accident, claimant was hospitalized for forty days.
 
 
 5
 Dr. T. V. Stonger treated claimant for the injuries related to his accident. The discharge summary indicated that claimant's status was one month and a half postburn and that the first stage of reconstruction had been completed. Claimant's laboratory and X-ray values while in the hospital were normal. He was seen for right-eye blurriness which had improved. His muscle strength in the right leg had improved, although claimant did report a decrease in muscle strength in the right leg immediately after the burn. He was discharged on no medications, and Dr. Stonger indicated he would require dressing changes and further reconstructive surgery. Joint Appendix at 94.
 
 
 6
 In March 1983, claimant underwent excision and revision of his forehead scar. On March 25, 1983, claimant had reconstructive surgery on the entrance wound on his right shoulder. In June 1983, Dr. Stonger stated that at claimant's last examination his wounds were well healed, but that claimant had some problems with the exit wound on his left foot. Dr. Stonger further noted that therapy had assisted claimant in regaining some strength and a full range of motion in the joints, but that a loss of motor power persisted on the right side. Claimant is right-hand dominant.
 
 
 7
 On June 8, 1983, claimant was examined by Dr. David B. Clark, Professor of Neurology at the University of Kentucky. Claimant complained of weakness and swelling in his right leg. Claimant stated that, although he believed he was making a fair recovery, he slept poorly, was constantly depressed, and suffered headaches. He complained of blurred vision and poor hearing. Dr. Clark noted that claimant possessed a stooping and peculiar gait, almost like a limp. Deep tendon reflexes were essentially equal. Strength was essentially equal in all muscle groups. Dr. Clark described claimant as 'vaguely suicidal, but only to the point of feeling on occasion that life is not worth living.' Joint Appendix at 131. He concluded that '[t]he story is clear enough, it is difficult to demonstrate actual weakness consistent with the patient's complaints.' He recommended further testing to be carried out if the patient desired. Joint Appendix at 132.
 
 
 8
 In July 1983, claimant entered Duke's Memorial Hospital for further reconstructive surgery. Dr. Stonger, claimant's treating physician from Montana, performed the surgery. He concluded that claimant was 'doing well at this time and the wound is healing well.' Joint Appendix at 134. He noted that claimant suffered a decreased range of motion and strength in the right leg, but concluded that claimant's physical examination was otherwise essentially normal. Joint Appendix at 135.
 
 
 9
 On July 23, 1983, claimant was examined by Dr. Craig Adjukovich, who stated that claimant complained of numbness in the lower right leg with intermittent pain. He indicated that claimant suffered from edema in his right leg. His neurologic examination revealed that claimant was oriented but possessed some motor weakness in the right lower extremity. Claimant possessed a decreased range of motion on the right side, but no detectable muscle spasm. He could not stoop, bend, or lift. He concluded that claimant was expected to undergo further reconstructive surgery and that healing could be expected to occur within twelve months. Joint Appendix at 141.
 
 
 10
 Claimant was hospitalized at Albert B. Chandler Medical Center between August 2 and August 8, 1983. He complained of intermittent swelling in the right leg and muscle weakness, lower back pain, and blurred vision. The patient had an unremarkable course while multiple consultations were obtained. The EMG studies showed no evidence of lower motor neuron dysfunction. Nerve conduction velocity studies were normal. Eyeglasses and a hearing aid were recommended. A psychiatric evaluation indicated that claimant was not significantly depressed. Neuropsychiatric testing showed that claimant's cognitive faculties were average. The excavated areas on his shoulder and feet, although oozing, did not require urgent care. Claimant was instructed to continue seeing his plastic surgeon. The impression was that claimant suffered camptocormia, a hysterical gait seen exclusively in males under stress. Joint Appendix at 147-48.
 
 
 11
 On September 13, 1983, Dr. Stonger wrote a letter to the Social Security Disability Determination Bureau. He indicated that claimant's disabilities were permanent, and he doubted that claimant would ever be able to go back to work.
 
 
 12
 At the administrative hearing, claimant testified that the accident caused him to suffer hearing and visual impairments. His vision has been corrected by eyeglasses, and he was fitted for a hearing aid on the day of his administrative hearing.
 
 
 13
 Although the entrance and exit wounds on claimant's shoulder and feet break open occasionally, claimant is not required to keep them bandaged. Claimant testified that his doctor told him not to worry about the sores, because he would take care of them in another two or three months. Joint Appendix at 28-29.
 
 
 14
 Dr. Adjukovich noted that claimant's impairments did not appear to restrict his daily activities. Joint Appendix at 140. Claimant testified that he is in and out of the grocery store he and his wife own every day. He does a limited amount of driving and occasional light cooking. His chief complaint is weakness in his right leg. He must walk with a cane.
 
 
 15
 The administrative law judge concluded that, although claimant cannot perform his past relevant work, he retains the residual functional capacity to perform sedentary work. He further concluded that, because claimant suffered from no significant nonexertional limitations, Rule 201.28, Table No. 1 of Appendix 2, directed a conclusion that claimant is not disabled.
 
 
 16
 The Appeals Council denied review by letter dated June 1, 1984. Claimant subsequently filed a complaint in the United States District Court for the Eastern District of Kentucky. The parties filed cross-motions for summary judgment, and on June 24, 1986, the magistrate issued a Report and Recommendation in which he concluded that, because the ALJ's decision was supported by substantial evidence, the Secretary's motion should be granted. On September 19, 1986, the district court, over claimant's objections, adopted the magistrate's report. This timely appeal followed.
 
 II.
 A.
 
 17
 Claimant argues that there is not substantial evidence to support the conclusion that he is able to perform sedentary work. Sedentary work is defined in the Social Security Regulations as follows:
 
 
 18
 Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
 
 
 19
 20 C.F.R. Sec. 404.1567.
 
 
 20
 In the present case, the ALJ applied Rule 201.28 of the grid, 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 1, in reaching the conclusion that claimant is not disabled. Pursuant to that rule, a younger individual, age 18 to 44, who has a high school education and no transferable skills is not disabled. The ALJ's application of the grid may be upheld only if the characteristics of the claimant identically match the descriptions in the grid. Otherwise, the grid may be used only as a guide to the disability determination. See, e.g., Hurt v. Secretary of Health & Human Services, 816 F.2d 1141, 1142-43 (6th Cir. 1987) (per curiam); Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 528 (6th Cir. 1981), cert. denied, 461 U.S. 957 (1983). In the present case, claimant's age and educational background are not disputed. Because he is a younger individual, age thirty-seven, and has a high school education, the issue of skill transferability is not material. Consequently, we must focus on whether claimant can, in fact, perform a full range of sedentary work.
 
 
 21
 Our review is limited by the familiar constraints of the substantial evidence rule. 'When supported by substantial evidence, the findings of fact of the Secretary are conclusive, and a decision denying benefits cannot be overturned.' Houston v. Secretary of Health & Human Services, 736 F.2d 365, 366 (6th Cir. 1984). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). 'Substantiality of the evidence must be based upon the record taken as a whole' and "must take into account whatever in the record fairly detracts from its weight." Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984) (quoting Beavers v. Secretary of Health, Education & Welfare, 577 F.2d 383, 387 (6th Cir. 1978)).
 
 
 22
 We conclude that the record as a whole supports the conclusion that claimant retains the residual functional capacity to perform sedentary work. Dr. Adjukovich noted that claimant's impairments do not appear to restrict his daily activities. Claimant testified that he is 'in and out' of his grocery store every day. He does occasional driving and light cooking.
 
 
 23
 Although claimant told Dr. Adjukovich he can sit for no more than two hours at a time, no physician has placed any restriction on his ability to sit. Thus, this case is distinguishable from those in which the medical evidence supported the argument that the need to alternate between sitting and standing precluded performance of sedentary work. Cf. Howse v. Heckler, 782 F.2d 626 (6th Cir. 1986) (per curiam) (when ALJ concluded that claimant could sit for no more then one hour at a time and this conclusion was supported by the record, claimant was incapable of performing sedentary work); Wages v. Secretary of Health & Human Services, 755 F.2d 495 (6th Cir. 1985) (per curiam) (claimant whose severe scoliosis prevented her from sitting or standing for prolonged periods of time was incapable of performing sedentary work).
 
 
 24
 '[A] determination that a claimant is able to perform sedentary work 'must be predicated upon a finding that the claimant can sit most of the day, with occasional interruptions of short duration." Shiner v. Heckler, 608 F. Supp. 481, 484 (D. Mass. 1985) (quoting Benko v. Schweiker, 551 F. Supp. 698, 704 (D.N.H. 1982)). In the present case, claimant's physicians have not imposed restrictions on his ability to sit. Moreover, his own testimony indicates that he moves around periodically throughout the day. This testimony supports the conclusion that he can perform the occasional walking or standing necessary for the performance of sedentary work. Under these circumstances, the Secretary's conclusion that claimant is able to perform sedentary work is supported by the record.
 
 
 25
 Claimant contends that we must give conclusion weight to Dr. Stonger's statement that he did 'not expect this patient to be able to go back to work due to permanent disabilities.' Joint Appendix at 166. The short answer to this contention is that the ultimate determination of disability is the prerogative of the Secretary, not the treating physician. See Houston, 736 F.2d at 367; Kirk, 667 F.2d at 536. As a general rule, the opinions of treating physicians are entitled to 'substantial deference.' King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984); Kirk, 667 F.2d at 536; Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980). However, this is true 'only if the treating physician's opinion is based on sufficient medical data.' Houston, 736 F.2d at 367; see also Murphy v. Secretary of Health & Human Services, 801 F.2d 182, 185 (6th Cir. 1986); Harris v. Heckler, 756 F.2d 431, 437 (6th Cir. 1985) (Wellford, J., dissenting) ('the treating physician's opinion . . . is not binding on the Secretary, especially when other evidence brings into question its basis and reliability'). A brief conclusory letter from the treating physician is not dispositive of the issue of disability. See Landsaw v. Secretary of Health & Human Services, 803 F.2d 211, 213 (6th Cir. 1986); Duncan v. Secretary of Health & Human Services, 801 F.2d 847, 855 (6th Cir. 1986); Houston, 736 F.2d at 367.
 
 
 26
 In the present case, Dr. Stonger's letter is phrased in conclusory terms, contains no supporting rationale, and is not supported by any clinical findings. The medical evidence as a whole does not substantiate the conclusion that claimant is precluded from performing any type of gainful activity. Moreover, we are not certain that the ALJ in fact rejected the treating physician's opinion, which was that claimant is not 'able to go back to work.' Joint Appendix at 166. The ALJ apparently read Dr. Stonger's statement as simply an indication that claimant cannot perform his past heavy work. He concluded that '[a]lthough Dr. Stonger stated that the claimant would still require further reconstructive surgery and physical therapy, he does not preclude claimant's return to work . . .. [T]here is nothing in the medical evidence to preclude the claimant's return to sedentary work.' Joint Appendix at 11. Under these circumstances, the ALJ did not err in concluding that Dr. Stonger's letter did not mandate a finding of total disability.
 
 B.
 
 27
 Claimant's final argument is that the ALJ erred in applying the grid to determine disability. The ALJ may not apply the grid if claimant suffers from a nonexertional limitation that significantly limits his ability to perform the full range of work at the designated exertional level. See, e.g., Kimbrough v. Secretary of Health & Human Services, 801 F.2d 794, 796 (6th Cir. 1986) (per curiam); Damron v. Secretary of Health & Human Services, 778 F.2d 279, 281-82 (6th Cir. 1985); Kirk, 667 F.2d at 528-29. In Kimbrough, we recognized that 'the mere possibility of a nonexertional impairment is insufficient. Not even a minor nonexertional limitation is enough; the claimant must show an impairment that significantly limits his ability to do a full range of work at a designated level.' 801 F.2d at 796. In the present case, claimant identifies four nonexertional impairments that preclude application of the grid: a hearing impairment, a psychological impairment, a postural impairment, and pain.
 
 
 28
 To support his conclusion that he suffers from a hearing impairment, claimant cites Dr. Guggenheim's statement that claimant suffers from bilateral high frequency hearing loss and has difficulty discriminating normal conversation in the presence of competing noise. However, Dr. Adjukovich concluded that claimant's hearing was grossly normal. Joint Appendix at 139. Dr. Clark noted that '[a]uditory acuity to the whispered voice is quite good bilaterally.' Joint Appendix at 132. Hearing aids were recommended in August 1983, and claimant was fitted for them on the day of the hearing. Claimant apparently had no difficulty hearing questions throughout the course of the administrative proceeding. Under these circumstances, the ALJ did not err in concluding that claimant's hearing impairment is not significant enough to preclude a full range of work at the sedentary level.
 
 
 29
 To support the conclusion that he suffers from a psychological impairment, claimant relies on Dr. Clark's passing reference that claimant was 'vaguely suicidal, but only to the point of feeling on occasion that life is not worth living.' Joint Appendix at 131. However, a later neuropsychological consultation showed testing within normal limits. Claimant was described as generally optimistic. The consultation report indicated that claimant 'may have his moods but is not depressed, only intermittently discouraged.' Joint Appendix at 152. Other than Dr. Clark's oblique reference, there is no indication that claimant suffers from a psychological abnormality, and the neuropsychological consultations support the conclusion that no such impairment exists.
 
 
 30
 Claimant argues that he suffers from a postural limitation which precludes him from bending and stooping. He relies on Social Security Ruling 85-7, which states that these impairments are nonexertional impairments. However, Soc. Sec. Rul. 85-7 has been superseded by Soc. Sec. Rul. 85-15, Titles II and XVI: Capability to do Other Work--The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments. In Ruling 85-15, the Secretary noted that 'some stooping . . . is required to do almost any kind of work . . .. If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact.' Thus, the limitations on claimant's ability to stoop do not preclude application of the grid in this case.
 
 
 31
 Finally, claimant appears to argue that he suffers pain of sufficient severity to preclude application of the grid. As noted above, application of the grid is precluded only if claimant's pain significantly limits his ability to perform a full range of sedentary work. The mere existence of some degree of pain is insufficient. See Kimbrough, 801 F.2d at 796-97. In the present case, the record does not indicate that claimant has ever received medication for pain. Dr. Adjukovich described claimant's pain as 'intermittent.' Dr. Stonger has never indicated that claimant suffers from severe pain.
 
 
 32
 We find that substantial evidence supports the conclusion that claimant's nonexertional impairments are not severe enough to preclude performance of a full range of work at the sedentary level. Accordingly, the ALJ's application of the grid was not improper.
 
 III.
 
 33
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 34
 GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, dissenting.
 
 
 35
 Contrary to the view of this case expressed by my colleagues, I believe that Mr. Sickman, on the record described by the government, has been disabled from all gainful employment for well in excess of one year. The Secretary's statement of facts reads as follows:
 
 B. Statement of the Facts
 
 36
 Claimant was injured November 5, 1982 in Butte, Montana, when he was hit by a high voltage electrical wire (Tr. 25-26). He was hospitalized and treated for a scalp laceration and electrical burns (Tr. 94-122). Claimant had a decrease in muscle strength in his right leg immediately after the burn, but his muscle strength improved during the course of his hospitalization; a right eye blurriness also improved. Claimant was discharged December 15, 1982 on no medications (Tr. 94).
 
 
 37
 The record shows few check-ups during the next two to three months. Office notes from his treating physician, Dr. T. V. Stonger, show no visits in January 1983 and only one visit in February (Tr. 163). The March, claimant underwent, on an outpatient basis, an excision and revision of his forehead scar (Tr. 124, 163); on March 25, 1986, claimant had reconstructive surgery of the entrance wound on his right shoulder (Tr. 123, 164). Dr. Stonger last saw claimant on April 6, 1983, before claimant moved from Montana to Kentucky (Tr. 164). Responding to a letter from the Social Security Administration in June 1983, Dr. Stonger stated that, at claimant's last examination, his wounds were well-healed. Dr. Stonger noted, however, that he believed claimant had some problems with an exist wound on his left foot (Tr. 162). He further noted that with therapy claimant had regained some strength and a full range of motion of the joints, but that a loss of motor power persisted on the right side. Dr. Stonger recommended further therapy and a neurological evaluation (Tr. 162).
 
 
 38
 Two months after his last examination in Montana by Dr. Stonger, claimant was examined by Dr. David B. Clark, a neurologist at the University of Kentucky (Tr. 130-132). Claimant believed he was making a fair recovery, although he had generalized headaches, slept poorly, and was constantly depressed; he also complained of swelling and weakness in his right leg (Tr. 103). Claimant stated his right eye was 'weak,' and hearing in his right ear was 'down' (Tr. 131). Dr. Clark described claimant as 'vaguely suicidal, but only to the point of feeling on occasion that life is not worth living' (Tr. 131). Upon examination, Dr. Clark noted that claimant had gained thirty pounds since his injury; his current weight was 274 pounds. Claimant had a 'stooping and peculiar' gait and it was noted that his right knee occasionally hyperflexed, although it did not cause claimant to fall. There was no focal atrophy and no fasciculations; deep tendon reflexes were present and equal. In the upper extremities, sensation was intact and strength was essentially equal. In the lower extremities, strength was difficult to estimate, but testing of specific muscle groups revealed little asymmetry. Deep tendon reflexes were present and symmetrical. Light touch and position sense was intact. Vibratory sense was diminished, but more on the left than the right, and there was a vague though inconstant impairment of pin prick sensation on claimant's right side. Peripheral pulses were all good (Tr. 131). Dr. Clark noted mild pitting edema on the right leg and lower skin; he also noted the extensive, but healed, scars secondary to the electrical burns (Tr. 132). Commenting that it was difficult to demonstrate actual weakness consistent with claimant's complaints, Dr. Clark recommended further testing. For claimant's other complaints, Dr. Clark recommended an ophthalmological evaluation on claimant's right eye and neuropsychiatric testing (Tr. 132). Dr. Clark noted that claimant's auditory acuity to the whispered voice was quite good bilaterally; he did not recommend further evaluation of claimant's alleged hearing loss (Tr. 131-132).
 
 
 39
 One month later, in July 1983, claimant entered Dukes Memorial Hospital in Peru, Indiana, for further reconstructive surgery. Dr. Stonger, claimant's physician in Mentana, was shown as the attending physician (Tr. 134-138). Claimant did well postoperatively and the wound healed well (Tr. 134). Physical examination of claimant's extremities showed decreased strength on the right side but no other directive signs (Tr. 135). Claimant was discharged two days after the surgery (Tr. 134).
 
 
 40
 Less than two weeks after this surgery, claimant underwent a consultative examination by Dr. Craig Ajdukovich (Tr. 139-146). Claimant complained of upper back pain resulting from chronic draining of the entrance wound (Tr. 139). Although he also complained of chronic numbness in his right leg, claimant described right leg pain as intermittent. Claimant stated that both legs swell, but only after he has been on his feet for one-half to one hour; he can walk 200 feet with a cane and he can sit for two hours at a time (Tr. 139). Upon examination, claimant's weight was 274 pounds and his hearing was grossly normal. Visual acuity without glasses was 20/50 in the right eye, 20/25 in the left eye, and 20/25 for both eyes (Tr. 139). Dr. Ajdukovich noted that there was no neurologic deficit in the right leg, although there was some focal motor weakness and reduced muscle strength (Tr. 141). Claimant had no definite joint abnormalities and no detectable muscle spasm; he did have positive straight leg raising at 20 degrees on the right and 80 degrees on the left (Tr. 140, 143). Claimant was unable to stand without a cane, and he could not stoop, bend, or lift; however, he was able to sit through the entire examination (Tr. 140). Lumbosacral x-rays showed very mild degenerative spurring and x-rays of the right knee, though suboptimal, appeared to show normal tibia and fibula proximal to the knee (Tr. 140). Dr. Ajdukovich commented that claimant may have an element of low back strain due to his obesity (Tr. 141). Claimant was expected to undergo further skin grafts with wound healing expected within twelve months (Tr. 141).
 
 
 41
 Claimant was hospitalized by Dr. Clark for six days in August 1983 for evaluation of his complaints (Tr. 147-161). Physical examination showed full motor strength and the sensory examination was basically intact, although there was some diminished vibratory sense, more so on the left than the right (Tr. 147). Claimant's hospital course was unremarkable. Electromyogram studies showed no evidence of lower motor neuron dysfunction; nerve conduction velocity studies were normal (Tr. 147). An ophthalmological consultation showed 20/100 and 20/120 vision in the right and left eyes respectively; corrective lenses were recommended (Tr. 148, 157). An audiological consultation revealed high frequency hearing loss with decreased speech discrimination in the presence of competing noise; the examiner recommended a hearing aid (Tr. 148, 158-160). A plastic surgery consultant saw claimant and stated that his draining wounds did not require urgent care (Tr. 148). An orthopedic consultant noted that claimant walked with a forward lurch, and diagnosed probable camptocormia which is a hysterical gait seen in males under stress (Tr. 148).
 
 
 42
 Claimant also underwent a neuropsychological evaluation (Tr. 150, 152). Testing was essentially within normal limits, indicating only a longstanding problem with spelling. Claimant also had a relative weakness in his left hand, which is his non-preferred hand. Claimant revealed a less than average amount of concern about his physical ailments and he had a generally optimistic outlook (Tr. 150). The physician noted that claimant was not depressed; rather, he was intermittently discouraged (Tr. 152).
 
 
 43
 On September 13, 1983, Dr. Stonger wrote a brief letter stating that he did not expect claimant to be able to go back to work due to permanent disabilities associated with his right leg and right arm, burn area injuries, and damage to the right retina (Tr. 166). The letter contained no objective findings and no articulated rationale to support that conclusion.
 
 
 44
 At the hearing on March 14, 1984, claimant alleged disability due to hearing and visual problems, weakness in his right side, and the wounds in his back and feet (Tr. 28). Although the wounds drain from time to time, claimant said his doctor told him not to worry about this and he would have another operation in two or three months to take care of the drainage problem (Tr. 29). Claimant testified that he has glasses to correct his visual problem and that he does see better with them (Tr. 32). Claimant further testified that he reads now that he has glasses (Tr. 37). When asked about his hearing, claimant stated that he was going to pick up his hearing aids on that day (Tr. 32). There is no indication from the hearing transcript, however, that claimant had difficulty hearing questions from his attorney or the administrative law judge. Questions were answered appropriately and without requests for repetition (Tr. 20-39).
 
 
 45
 Claimant stated that the pain in his right leg feels like a toothache (Tr. 34). He helps his wife run their grocery store (Tr. 36) and he is 'in and out of it quite a bit'; claimant lives above the store (Tr. 38). He still drives a car (Tr. 38). Claimant was thirty-seven years old at the time of the hearing decision and he has a high school education (Tr. 23). He has past relevant work as a greaser and oiler, a truck driver, and a general handyman (Tr. 27, 36).
 
 
 46
 I would, of course, concede that since claimant is both alive and up and about, he may have become employable as of the date of this appeal in August 1987. I cannot, however, escape the conclusion that the Secretary's own statement of facts demonstrates a condition of employment disability for more than one year.